IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **NORRIS ARMSTRONG, et al.,** | ) | |
| | ) | |
|     **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 03-0148-WS-C |
| | ) | |
| **HRB ROYALTY, INC., et al.,** | ) | |
| | ) | |
|     **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **HRB ROYALTY, INC., et al.,** | ) | |
| | ) | |
|     **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 03-0635-WS-C |
| | ) | |
| **NORRIS ARMSTRONG, et al.,** | ) | |
| | ) | |
|     **Defendants.** | ) | |

**ORDER**

This matter is before the Court on a motion in limine filed by the Block defendants ("Block") to exclude the testimony of plaintiffs' expert witnesses Ernest H. Manuel, Jr. and Jeffrey R. Sport. (Doc. 194). The parties have filed briefs in support of their respective positions, (Docs. 195, 203, 204, 218, 240, 282), and the motion is ripe for resolution. After carefully considering the foregoing materials, the Court concludes that the motion is due to be granted in part and denied in part.

**BACKGROUND**

In 1999, Block was engaged in litigation with a number of its major franchisees ("the Missouri litigation"). Armstrong Business Services, Inc., ("ABS"), one of the plaintiffs herein, was a party to that lawsuit. (Doc. 209 at 2). The parties engaged in settlement negotiations in October 1999 and, the following month, a representative of the major franchisees sent Block a letter summarizing what he

believed to be the parties' agreement for settlement of the Missouri litigation. (*Id*. at 2-3 & Exhibit 1). Under a paragraph entitled, "Term of Contract," the letter contemplates amending each existing franchise agreement to provide for a 60-year term with automatic 10-year renewal periods and to provide Block, at the conclusion of each such interval, a purchase option "at a price equal to four times gross revenues," ("the multiplier"), subject to certain deductions. (*Id*.).[1] No settlement along these lines was finalized. (*Id*. at 9).

The parties operated under franchise agreements providing that "[t]he term of this Agreement shall run for a period of five years from the date hereof, with further provisions [sic] that it shall be automatically renewed for successive periods of five years each, unless mutually terminated or terminated pursuant to paragraph 12." (Doc. 236, Exhibit 1 at 11, ¶ 18). Block filed a counterclaim in the Missouri litigation, seeking in part a declaration that this language entitled Block to unilaterally terminate the agreements at the end of any five-year term by declining to renew them. In 2002, the Missouri Court of Appeals agreed with Block, ruling that this language did not create perpetual contracts but contracts with fixed five-year terms renewable only upon the parties' mutual consent, failing which the agreements expire at the end of any given five-year term. *Armstrong Business Services, Inc. v. H&R Block*, 96 S.W.3d 867 (Mo. App. 2002). Block thereafter gave the plaintiffs notice that it would not renew the franchise agreements when their then-current five year terms expired in 2003.

The franchise agreements also provide that, in the event of termination for any reason other than sale to Block, "Block shall pay a fair and equitable price to Franchisee for Franchisee's business operated hereunder," subject to certain minima. (Doc. 236, Exhibit 1 at 12-13, ¶ 24).[2] In this lawsuit the plaintiffs demand payment of a "fair and equitable price" pursuant to paragraph 24. The plaintiffs

---

[1] Block describes the multiplier as part of "the settlement offer made by Block in 1999." (Doc. 209 at 8; *accord id.* at 10).

[2] The "fair and equitable price" must be "no less than the total of" four items, including: (a) the depreciated book value of the franchisee's lien-free equipment; (b) the franchisee's expended costs for usable supplies on hand; (c) 80% of the franchisee's total revenues for the 12-month period ending the previous April 30; and (d) certain off-season expenses in excess of off-season revenue. (*Id*.).

proffer Manuel and Sport as expert witnesses in connection with the calculation of a "fair and equitable price." Block argues that their testimony is inadmissible under Federal Rules of Evidence 401, 402, 403, 702 and 703 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and like cases.

## EXPERT OPINIONS

Manuel is an economist, Sport a CPA. Neither has ever valued a business under the nomenclature, "fair and equitable price." Both conclude that the term means something different than and, at least in this case, more than, "fair market value." Sport provides two alternative calculations of fair and equitable price; Manuel uses two similar formulae, plus a third not employed by Sport. Primary elements of each calculation are some combination of: (a) future net profits to the plaintiffs had they operated the franchises through 2009; and/or (b) a multiple of final year gross revenues. The first factor is keyed to the plaintiffs' asserted expectations as to how long they would hold the franchises, and the second is keyed to Block's 1999 settlement proposal in the Missouri litigation. All figures were discounted to present value. The calculations of the plaintiffs' experts are summarized below.

|  | Manuel | Sport |
|---|---|---|
| 1. 2003 gross revenue x 4 | $8,444,484 | $8,534,610 |
| Sum of ¶ 24(a), (b), (d) | 760,639 | 759,639 |
| Total | $9,205,123 | $9,294,249 |
|  |  |  |
| 2. Net profit, 2004-2009 | $3,006,047 | $2,878,726 |
| 2009 gross revenue x 2 | 5,116,069 | 5,448,198 |
| Total | $8,122,116 | $8,326,924 |
|  |  |  |
| 3. Net profit, 2004-2009 | $3,006,047 |  |
| 2009 gross revenue x 4 | 10,232,139 |  |
| Total | $13,238,186 |  |

(Doc. 195, Exhibit 5 at 60-62; *id*., Exhibit 7 at 85-87).

Block's valuation expert, Charles M. Phillips, is also a CPA. Like the plaintiffs' experts, he has never valued a business under a "fair and equitable price" standard. Unlike them, however, he does not consider the term to encompass a premium above fair market value. Using a discounted cash flow ("DCF") method and projected revenues and expenses of the franchises through 2009, Phillips calculates "fair and equitable price" for the franchises as $1,759,096. This amount is less than the $1,875,932 Phillips calculates as the minimum payment required by paragraph 24(a)-(d). (Doc. 254, Exhibit 1 at 4, 22 & Exhibit B-2).

**DISCUSSION**

The requirements for the admission of expert testimony in light of *Daubert* are well known and need not be regurgitated at length herein. "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc*., 158 F.3d 548, 562 (11th Cir. 1998)(footnote omitted). There are thus three discrete inquiries: qualifications, relevance, and reliability.[3] The burden of establishing these three requisites lies with the proponent. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)(en banc).[4]

An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)(an economic

---

[3]*See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)(although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate").

[4]Expert testimony must also satisfy other applicable rules of evidence, including Rules 401, 402 and 403. *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1309 (11th Cir. 1999).

expert was qualified even though he "ha[d] no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs"); *id*. at 669 (expert knowledgeable concerning the practices of Mexican immigration authorities generally was qualified to testify even though he had no experience with Monterey officials in particular).

To the requirement of Rule 401 that evidence possess a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," Rule 702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." The evidence must "concern matters that are beyond the understanding of the average lay person. ... Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d at 1262-63. In addition, the expert evidence "must have a valid scientific connection to the disputed facts in the case." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). That is, there must be an adequate "fit" between the evidence and the case, which may be lacking, for example, when the expert attempts to extrapolate animal studies into the human sphere. *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

The most heavily litigated component of the *Daubert* analysis is reliability. Expert testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning more than subjective belief or unsupported assumptions." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community. 509 U.S. at 593-94. "Notably, ... these

factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Technology DC-8, Inc.  v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*,  400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

Whatever factors are considered, the Court's focus should "be solely on principles and methodology, not the conclusions they generate." *Allison v. McGhan Medical Corp*., 184 F.3d at 1312 (internal quotes omitted).  It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions.  *Quiet Technology v. Hurel-Dubois*, 326 F.3d at 1341.  Thus, for example, "a district court may not exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness."  *Rink v. Cheminova*, 400 F.3d at 1293 n.7.

With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability.  *See Quiet Technology v. Hurel-Dubois*, 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion under *Daubert*).

Certain additional observations are worth making.  "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough [to carry the proponent's burden]."  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005).  Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."  *Id*. at 1111 (internal quotes omitted).  An expert's unexplained assurance that her opinions rest on accepted principles fares no better.  *McClain v. Metabolife International, Inc*., 401 F.3d 1233, 1222 (11th Cir. 2005).

Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for every step in the analysis — means that *any* step that

renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (emphasis in original)(internal quotes omitted); *accord Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").[5]

Neither side has requested a hearing. A trial court's decision whether to hold such a hearing is committed to its sound discretion, *Cook v. Sheriff of Monroe County*, 402 F.3d at 1113, and absent a request the Court concludes that no hearing is required. *Cf. id.* at 1108, 1114 (no abuse of discretion in failing to hold a hearing when not requested). Even when a hearing is requested, the court has discretion to deny the request, especially when the case is not a complicated one involving multiple expert witnesses. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). Although there are multiple expert witnesses in this case, their testimony is not — despite the best efforts of the parties to suggest otherwise — particularly complicated, especially compared with those cases involving dueling medical evidence as to which a hearing may be a fruitful exercise. *See id.* (trial court should grant a motion for hearing when the opponent presents conflicting medical literature and expert testimony).

As discussed in the Court's order denying Block's motion in limine to exclude evidence concerning plaintiff Armstrong's expectations of the agreements' duration, the phrase "fair and equitable price" unambiguously excludes equitable considerations. However, the term is ambiguous as to the time as of which the valuation is to be pegged and as to whether it approximates "fair market value" or envisions different valuation criteria. Because the phrase is ambiguous, it will be for the jury to decide its meaning and thus how valuation should proceed.[6] The issue here is the extent, if any, to which Manuel and/or Sport can testify as experts to aid the jury in making that determination.

---

[5]Having set forth these governing principles, the Court will not repeat them each time one becomes applicable to a particular expert or argument advanced by the parties.

[6]On the matter of contract interpretation by the jury, Block submitted the affidavit of William T. Ross to establish that Block did not author the franchise agreements. (Doc. 218, Exhibit 10). The plaintiffs have moved to exclude the affidavit. (Doc. 223). Because the Court need not consider the affidavit in order to decide any pending motion, the motion to strike is **denied as moot**.

### A.  Qualifications.

Block argues that, due to their admitted unfamiliarity with "fair and equitable price," Manuel and Sport are unqualified to render an expert opinion that it includes a premium over fair market value or that the premium should be calculated using particular attributes such as future profits and/or a multiple of present or future gross revenues.  The Court agrees.  The plaintiffs have cited, and the Court has located, no support for the proposition that one professing ignorance of a term is thereby qualified to render an expert opinion as to its meaning.  Such a person by definition possesses no "knowledge, skill, experience, training, or education" sufficient to testify as an expert.

The plaintiffs cite *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), but that opinion is of no assistance to them.  In *Maiz*, the Court ruled that a forensic accounting expert was entitled, "to the extent he spoke of the contracts" at issue, to "d[o] so in the context of setting forth or explaining reasonable assumptions he was asked to make by counsel."  *Id*. at 667.  The Court suggested that, to the extent the witness purported to testify as an expert as to the meaning of disputed terms, there was error but not reversible error.  *Id*. at 666-67.  *Maiz* may allow Manuel and Sport to testify concerning the assumptions as to the franchise agreements' meaning that they were asked to make by counsel in creating their valuations, but it does not entitle them to testify as experts as to the meaning of the agreements.

Thus, Manuel and Sport cannot testify as experts concerning:

- the meaning of "fair and equitable price" or its relation to fair market value;
- the proper components of a fair and equitable price, including: lost future profits; terminal price as a multiple of gross revenues; and/or the categories identified in paragraph 24(a)-(b) and (d) as being in addition to a multiple of gross revenues;
- the meaning of paragraph 18 or 25 of the franchise agreements;
- the parties' expectations as to the duration of the franchise agreements or the bases of those expectations;

- the meaning, correctness or fairness of any court order.[7]

A similar disability presumably extends to Block's valuation expert, whose unfamiliarity with "fair and equitable price" rivals that of Manuel and Sport.[8]  If so, the jury will hear no expert testimony as to what "fair and equitable price" means or how it should be calculated.  The calculations prepared by the experts will simply be available for use by the jury should it determine from the evidence that those of one or another reflect or best approximate its conclusion as to what "fair and equitable price" means.[9]

### B.  Relevance and Reliability.

Block argues that Manuel and Sport cannot testify even as to the assumptions they were asked to rely on by counsel, to the extent those assumptions included: (1) an actual or expected duration of the agreements past 2003; or (2) a multiple of present or future gross revenues.  Block argues that all such evidence is factually and/or legally irrelevant, such that their utilization would yield unreliable quantifications of fair and equitable price.

The ruling of the Missouri Court of Appeals establishes conclusively the duration of the franchise agreements, and any contrary assumption is thus necessarily unreliable.   However, and as discussed in the Court's order granting in part Block's motion in limine concerning  Armstrong's

---

[7]This ruling does not preclude Manuel and Sport from testifying (if they can do so consistent with Rule 702, *Daubert* and other evidentiary rules) that, for example, their methodology or any component of it is used by accounting and/or economic experts in other relevant valuation schemes.  What they may not do is testify that their methodology or any portion of it represents an appropriate measure of fair and equitable price.

[8]Phillips was reduced to "seek[ing] guidance in a dictionary for the definitions of the words fair and equitable used as adjectives."  (Doc. 220 at 116).

[9]Because Phillips calculated fair market value and did so using a recognized (DCF) method, and because the plaintiffs have not challenged his qualifications to do so, Phillips may testify as an expert as to the calculation of the business' fair market value.  What he may not do — without showing expert qualifications to do so far beyond those identified in his report —  is testify that fair market value is an appropriate measure of fair and equitable price.

expectations regarding the duration of the franchises, the agreements do not unambiguously preclude evidence of such expectations, and it remains open to the plaintiffs to prove the parties intended that the business be valued as of the expected date of termination (i.e., Armstrong's retirement) rather than as of the actual date of termination. Moreover, and as set forth in the same order and in the Court's order denying Block's motion to clarify, the plaintiffs' claim that Block is equitably estopped to deny that the parties' expectations as to duration are relevant to the determination of fair and equitable price is still a part of this lawsuit. Given this situation, the opinions of Manuel and Sport cannot be excluded on the grounds that the parties' expectations as to the agreements' duration are irrelevant or that consideration of them consequently results in unreliable calculations of fair and equitable price.

The Court has already rejected Block's motion in limine, based on Rules 402, 403 and 408, to exclude evidence relating to settlement offers and discussions.[10] Block's insistence that a settlement offer necessarily is an unreliable indicator of value simply repackages the argument made and rejected in that motion. Thus, the opinions of Manuel and Sport cannot be excluded on the grounds that the settlement proposal is irrelevant or that consideration of it consequently results in unreliable calculations of fair and equitable price.

### C. Challenges to Calculations.

Block identifies three errors in the calculations of Manuel and Sport which, it says, renders their mathematical conclusions unreliable: (1) in calculating net profit for the years 2004-2009, they relied on the franchises' historical performance from 1998-2002 but not 2003, a year in which revenues declined; (2) in calculating future net profits, they assumed that the plaintiffs would develop ten new offices over the next ten years; and (3) Sport used a lower discount rate than he would use for clients not in litigation. (Doc. 195 at 25-30; Doc. 218 at 9-11).

Block does not assert that a prior year's results can never be ignored or discounted, but argues

---

[10]Because the settlement proposal is not inadmissible under those rules, Block's argument under Rule 703, which rule assumes the inadmissibility of evidence relied on by an expert, need not be considered. (Doc. 195 at 34-36).

-10-

that the experts' reasons for ignoring 2003 were makeweight. Assuming without deciding that Manuel and Sport had no legitimate reason to ignore 2003 results, the cases cited by Block as supporting exclusion involved egregious omissions not comparable with that at issue here. As the Eleventh Circuit has stated, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Technology v. Hurel-Dubois*, 326 F.3d at 1346 (internal quotes omitted). Likewise, plugging incorrect numbers into a reliable formula serves only to "impugn the accuracy of [the expert's] results." *Id*. at 1345.

Armstrong advised Manuel and Sport that he planned to open ten offices between 2003 and 2013, and the experts utilized that information in calculating future net profits. Block offers no evidence that Armstrong did not harbor these plans or that they were ill-formed or unrealistic. Instead, Block faults Manuel and Sport for failing to perform independent feasibility studies or to confirm the sequence, timing and location of the new offices. Block relies on cases in which assumptions about future economic activity were facially unreasonable, but it has done nothing to show such unreasonableness here.

Sport testified that he used a conservative discount rate, the equivalent of a thirty-year treasury rate, resulting in a relatively high present value. He testified that he did so because such conservatism ensures that the client will in fact receive the stream of income payments indicated by his estimates of future profits. He also testified that, if he were valuing ABS for a potential purchaser, he would use a higher discount rate reflecting market risk and other factors that a potential purchaser should take into consideration. (Sport Deposition at 30-31). Block describes Sport's approach as litigation-driven, but it is more accurate to say that it is client-driven. When representing a purchaser, Sport employs a higher discount rate to prevent the client from paying too much but, when representing a seller, he employs a lower discount rate to prevent the client from receiving too little. Sport's testimony suggests that this approach is in line with what reasonable CPAs do, and Block has not contradicted that proposition. Nor has Block shown that this is anything more than a dispute over variables and thus an inappropriate basis for exclusion.

**D.  Rule 403.**

Block's argument focuses on the damage that would be done were Manuel and Sport allowed to offer expert testimony that their calculations measure fair and equitable price.  (Doc. 195 at 41-43). However, as discussed in Parts A and B, they will not be allowed to so testify but only to offer calculations based on what are at this juncture supportable assumptions provided by counsel.  The alleged flaws in their computations of future net profit and present value are, as discussed in Part C, readily amenable to effective challenge on cross-examination.  As limited by this order, the probative value of the testimony of Manuel and Sport is not "substantially outweighed" by the concerns Rule 403 addresses.

## CONCLUSION

For the reasons set forth above, Block's motion in limine to exclude the testimony of plaintiffs' expert witnesses is **granted** to the extent that the plaintiffs are precluded from offering purportedly expert testimony as to: the meaning of the term "fair and equitable price" or its relation to fair market value; the proper components of a fair and equitable price; the meaning of paragraphs 18 or 25 of the franchise agreements; the parties' expectations as to the duration of the franchise agreements, or the bases of those expectations; or the meaning, correctness or fairness of any court order.  In all other respects, Block's motion is **denied**.

DONE and ORDERED this 14th day of October, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE