IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **NORRIS ARMSTRONG, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 03-0148-WS-C** |
| | ) | |
| **HRB ROYALTY, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **HRB ROYALTY, INC., et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 03-0635-WS-C** |
| | ) | |
| **NORRIS ARMSTRONG, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This matter is before the Court on the motion of the Block defendants ("Block") to exclude evidence of settlement proposals or, in the alternative, to certify the issue for interlocutory appeal. (Doc. 307). Also presented is the motion of plaintiff Armstrong Business Systems, Inc. ("ABS") to strike Block's motion. (Doc. 311). The parties have submitted briefs in support of their respective positions, (Docs. 308, 315, 325), and the motions are ripe for resolution. After carefully considering the foregoing materials, the Court concludes that all three motions are due to be denied.

**BACKGROUND**

As set forth in previous orders, Count Nine of the third amended complaint filed by plaintiff Armstrong Business Systems, Inc. ("ABS") is for the payment of a "fair and equitable price" as required by paragraph 24 of the franchise agreements. The Court has held that this term, while unambiguously excluding consideration of the parties' fairness vel non towards each

other, does not unambiguously mean "fair market value." (Doc. 300 at 5-7). ABS intends to argue that "fair and equitable price" should be measured as four times its annual gross revenue ("the multiplier"), based in large part on a settlement offer Block made during the Missouri litigation which employed that multiplier as the measure of Block's cost to exercise an option to purchase a franchise.

Block moved to exclude this evidence pursuant to Federal Rules of Evidence 402, 403 and 408. (Doc. 208). While Block's briefing focused on other arguments, it mentioned — but did not develop — an argument that the evidence should be excluded because ABS, prior to mediation in the Missouri litigation, had agreed to keep such matters confidential. ABS ignored Block's argument, leaving the Court with insufficient briefing upon which to either accept or reject the argument. To help clear the docket, which was then choked with almost 20 pending motions, the Court denied Block's motion in limine, but with the express understanding that "[t]his order does not preclude Block from [supporting its confidentiality argument] at a later date." (Doc. 301 at 13 n.26). The instant motion followed.

A two-day mediation conference was held in Dallas, Texas on October 28 and 29, 1999. Attending were representatives of Block and the major franchisees (including ABS), as well as Jerry Grissom, the mediator. On October 20, 1999, an attorney for Block wrote an attorney for the major franchisees "to confirm the understanding of the parties concerning the settlement meeting scheduled for next week." (Doc. 308, Exhibit 2 at 1). Among the provisions of the pre-mediation agreement identified in the letter is the following:

> All of the parties agree that sectio[n] ... 154.073 (confidentiality of
> communications) of the Alternative Dispute Resolution Procedure
> contained in the Texas Civil Practice and Remedies Code (copy attached)
> shall apply with respect to these discussions, and all persons attending the
> discussions will sign an acknowledgment to that effect in the form attached.

(*Id*. at 1, ¶ 4). The letter called for the major franchisees' counsel to sign the letter and return a copy if the letter "correctly recites the parties' agreement." (*Id*. at 3). The major franchisees' counsel did so. (*Id*.).

The major franchisees, including Norris Armstrong on behalf of ABS, subsequently executed the following:

> Having had the opportunity to consult with counsel of my choosing,

> I hereby agree that Sections 154.023, 154.053, 154.055, 154.071, and 154.073 of the Alternative Dispute Resolution Procedures contained in the Texas Civil Practice & Remedies Code shall be applicable to the settlement discussions conducted in Dallas, Texas on October 28–29, 1999 in connection with the referenced litigation, and I agree to be bound by those procedures.

(Doc. 308, Exhibit 3).

During the mediation conference in Dallas, Block made a settlement proposal which included amending the franchise agreements to reflect a 60-year term with automatic 10-year renewal periods and a decennial purchase option at a price based on the multiplier. (Doc. 308, Exhibit 4). The parties left Dallas without finalizing any settlement agreement.

October 29 was a Friday. The following Monday, November 1, 1999, Grissom wrote counsel for the parties the following:

> I thoroughly enjoyed working with your clients in the facilitated settlement discussions for this matter. I am delighted with the progress we accomplished and am allowing myself to entertain the feeling that our hard work resulted (or shortly will result) in resolving all issues. My congratulations to your clients on what we all left believing was a challenging, and at times difficult, but in the end, successful effort.
>
> Thank you again for the opportunity of working with your clients. ... I certainly do not wish more litigation on your clients but I do hope to work with you again. It would be a privilege.

(Doc. 325, Exhibit 1).

The same day, lawyers for the two sides spoke by telephone concerning the conference. (Doc. 308, Exhibit 4 at 1). Two days later, on November 3, 1999, counsel for the major franchisees wrote his counterpart stating that "the following [nine paragraphs covering three pages] are the deal points which the Majors believe there was agreement subject to documentation." (Doc. 308, Exhibit 4 at 1). The first of these points included a decennial purchase option based on the multiplier. (*Id*.). The final of these points was that "[l]egal proceedings are stayed until the final execution of documentation evidencing the foregoing agreements or until January 1, 2000, whichever date occurs first." (*Id*. at 3, ¶ 9). Counsel also confirmed that, "[p]er our telephone conference, I will take the first shot at drafting documents," including "Amendment to existing Major Franchise Agreements" and "Settlement Agreement encompassing the foregoing points." (*Id*. at 3-4). The letter concludes with the observation that

"[t]he litigators can handle drafting of the documentation concerning dismissal of the pending litigation as and when appropriate." (*Id*. at 4).

On December 17, 1999, counsel for Block wrote his counterpart, enclosing a "draft Settlement Agreement growing out of the parties' discussions in Dallas." (Doc. 325, Exhibit 4 at 1). The letter includes the following statement:

> 4. The recent Dallas meeting produced consensus on the basic outlines of a settlement approach and on many particular elements as well. The parties also recognized that numerous issues and details remained to be worked out. The attached draft is based on the discussions in Dallas; it also incorporates a few provisions Block considers appropriate even though they were not discussed in Dallas.

(*Id*. at 2, ¶ 4). The draft settlement agreement accompanying the December 17 letter included an amendment to the parties' franchise agreements providing Block a decennial purchase option based on the multiplier. (Doc 308, Exhibit 7 Attachment at 2, ¶ 1.B).[1]

On December 27, 1999, the largest franchisee circulated to the other major franchisees a copy of Block's December 17 proposal, in particular that part of the proposal that made changes to the parties' existing franchise agreements. (Doc. 308, Exhibit 4). The franchisee identified five pages of "questions and/or concerns" addressing at least 20 paragraphs or subparagraphs of Block's proposed franchise agreement, including the multiplicand as to which the multiplier was to be applied. *(Id.)*.

Texas law provides in pertinent part as follows:

(a) Except as provided by [later subsections, which are conceded to be inapplicable], a communication relating to the subject matter of any civil or criminal dispute made by a participant in an alternative dispute resolution procedure, whether before or after the institution of formal judicial proceedings, is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding.

V.T.C.A. Civ. Prac. & Rem. Code § 154.073(a) ("the Act").

ABS concedes that it may not rely on any statements or settlement proposals made by

---

[1]The December 17, 1999 letter as submitted by Block does not include the proposed settlement agreement. However, Block states that "[t]hat draft agreement was the same agreement referred to and attached to the December 27, 1999 memorandum that ABS seeks to introduce into evidence." (Doc. 325 at 10).

Block in Dallas on October 28 or 29, 1999, and it concedes that the multiplier proposal was advanced by Block within those parameters.  However, ABS argues that it is free to rely on repetitions of the multiplier proposal that occurred after the mediation conference ended.  As a practical matter, these include the November 3 letter and the December 17 proposal, as attached to the December 27 memorandum.  Block argues that the parties' agreement precludes ABS from relying on these repetitions, based on theories of waiver and estoppel.  Block further argues that both the agreement and public policy require exclusion pursuant to Federal Rule of Evidence 403.

## DISCUSSION

### A.  Motion to Strike.

ABS argues that Block's motion is untimely because the Court specified in July 2005 that "[n]o additional motion in limine or other pretrial motion will be considered unless it is based on circumstances that could not have been foreseen on or before April 21, 2005." (Doc. 287 at 2). Block's present motion is not in violation of this deadline.  As noted above, Block's previous motion in limine raised ABS's confidentiality agreement as a ground for excluding evidence of the multiplier, but neither Block nor ABS addressed the issue in sufficient detail to allow the Court to resolve the issue.  The Court could have ordered additional briefing at that time but, in order to clear the backlog of pending motions, it instead denied the motion in limine with leave to provide the additional briefing subsequently.  Because the Court had denied the motion in limine, Block was required to file what is technically a motion but what is in substance the supplemental briefing allowed by the Court.  In doing so, Block complied with both the letter and the spirit of the Court's orders.

In a similar vein, ABS argues that the instant motion constitutes a motion to reconsider and that Block cannot satisfy any predicate to reconsideration.  (Doc. 311 at 2-5).  The Court, however, did not previously rule on Block's argument that evidence of its settlement proposal should be precluded by ABS's confidentiality agreement, but rather affirmatively left the issue open, so it is not now "reconsidering" a prior ruling.  Moreover, and as just noted, the instant motion is substantively not a new motion at all but rather a further briefing of an argument asserted in the original motion, brought technically as a motion only to accommodate the Court's

desire to clear a surfeit of pending motions before the additional briefing was received.

Finally, ABS complains that Block is not being held to the "same rules and deadlines" as ABS. (Doc. 311 at 2). As noted above, Block has not been relieved of any rule or deadline applicable in this case. Nor does ABS's misapprehension that a stray comment from Judge Butler somehow exempted ABS from complying with the pleading requirements of Rule 8, and the Court's refusal to allow ABS to expand the scope of the lawsuit in the proposed pretrial order based on this misapprehension, (*id*.), show or suggest that ABS and Block are being held to different rules and deadlines.

### B.  Motion to Exclude.
### 1.  Waiver and Estoppel.

These theories depend on the premise that ABS's use of the multiplier as expressed in post-conference communications would violate the parties' confidentiality agreement. (Doc. 308 at 1-3, 10, 13, 14). Thus, the threshold issue is the scope of that agreement.[2]

The parties' agreement, executed by counsel for both sides, was that the Act "shall apply with respect to these discussions." (Doc. 308, Exhibit 2 at 1). The same sentence provides that all persons "attending the discussions" must sign an acknowledgment to this effect. Because the only forum mentioned in the agreement for "attending ... discussions" is "the settlement meeting scheduled for next week," which "will be held on October 28-29, 1999 in Dallas Texas," (*id*.), the agreement unambiguously equates "these discussions" as to which the Act applies with those occurring during the two-day mediation conference in Dallas. The franchisees' acknowledgment is substantively identical, reflecting their agreement that the Act "shall be applicable to the settlement discussions conducted in Dallas, Texas on October 28-29, 1999." (Doc. 308, Exhibit 3).

ABS argues that this language means that only communications occurring during the mediation conference in Dallas are subject to the agreement and, thus, to the Act. (Doc. 315 at

---

[2]The parties were in litigation in Missouri and apparently mediated in Dallas only because the largest franchisee lived there. (Doc. 308 at 4). This merely fortuitous connection to Texas presumably explains why Block does not argue that the Act applies independently of the parties' agreement.

1-3, 8). Block, which focuses its attention on the scope of the statute, does not respond to ABS's threshold argument concerning the scope of the agreement. The Court concludes that the parties' agreement unambiguously extends the protections of the Act only to proposals and other communications occurring during the mediation conference in Dallas on October 28 and 29, 1999.

The limited reach of the parties' agreement might not be fatal to Block's motion if the Act provided that, once a proposal is made during a mediation conference, later repetitions of the proposal are automatically protected because first made at the conference. Block advances no such argument and would not succeed if it had. The Act does not purport to grant blanket protection to post-conference communications if similar communications were made in conference but rather hinges the protection afforded any communication on whether that communication was "made ... in an alternative dispute resolution procedure."

Because the parties agreed only that communications made during the mediation conference would be subject to the Act, and because the Act does not render post-conference communications automatically protected by virtue of having previously been made during the conference, ABS's reliance on post-conference repetitions of Block's multiplier proposal does not violate the agreement. Because Block's theories of waiver and estoppel depend on the premise that ABS would violate the agreement by relying on the November 3 and December 17 repetitions, these theories of exclusion must fail.[3]

Even were the Act applicable to this case independently of the parties' agreement, Block has not shown that the Act would preclude ABS's reliance on Block's post-conference repetition of its multiplier proposal. Acknowledging the lack of Texas authority, Block argues that other

---

[3]Block complains that a party should not be able to "scuttle" confidentiality after mediation by sending a letter repeating its opponent's proposal. (Doc. 325 at 4 n.1). It may be assumed that the Act would not allow a party to unilaterally defeat the confidentiality of its opponent's proposal in this manner and that such a repetition would be considered to be the same "communication" as occurred in the conference. The franchisees, however, did not act unilaterally in writing the November 3 letter. Instead, and as Block's attorney insists, the November 3 letter was part of post-conference communications between counsel "in which we endeavored to document the settlement terms discussed at the Dallas meeting." (Doc. 309 Attachment, ¶ 5). Because Block agreed in advance to the preparation of the November 3 letter, it cannot exclude the letter as an unauthorized repetition of its multiplier proposal.

mediation statutes have been construed "to encompass the entire mediation process, including negotiations or documentation completed after the formal mediation meeting." (Doc. 325 at 11). None of Block's authorities, however, supports its desired result in this case.

In two of Block's cases, the applicable statute extended protection to communications made "in connection with" mediation,[4] an elastic term that the Act does not employ.[5]  Instead, the Act requires that the communication have been made "by a participant in [not "in connection with"] an alternative dispute resolution procedure."  Moreover, the communications at issue in one case were made in correspondence between mediation conferences, not after the mediator's involvement had ceased.[6]  The two letters at issue in the other "followed the mediation conference shortly in time," and one was copied to the mediator and suggested a meeting with him, while the other "terminated the pursuit of mediation."[7]

Two more of Block's authorities, contrary to its representation in brief, concern only communications made during or between mediation conferences, not afterwards.[8]  Another involved comments made as the participants were leaving the conference and, at any rate, the Fourth Circuit's pronouncement that the court-sponsored "mediation process" established by its local rule "continues until the mediated dispute has been either dismissed or is otherwise removed from the [Office of the Circuit Mediator]," reflects only that the mediation process continues as long as the mediator's involvement continues.[9]   Block's final authority suggested only that protection "may" extend to "drafts of settlement proposals agreed upon at mediation"

---

[4] *See Wilmington Hospitality, L.L.C. v. New Castle County*, 788 A.2d 536, 540-41 (Del. Ch. 2001); *In re: Marriage of Bidwell*, 21 P.3d 161, 164 (Or. App. 2001).

[5] The *Bidwell* Court equated "connection" with "a relationship, an association, or a link," 21 P.3d at 164 n.5 (internal quotes omitted).

[6] *See Wilmington Hospitality v. New Castle County*, 788 A.2d at 538-40.

[7] *In re: Marriage of Bidwell*, 21 P.3d at 164.

[8] *United States Fidelity & Guaranty Co. v. Bilt-Rite Contractors, Inc.*, 2005 WL 1168374 at *6-7 (E.D. Penn. 2005); *Paranzino v. Barnett Bank, N.A.*, 690 So. 2d 725, 726-28 (Fla. App. 1997).

[9] *In re: Anonymous*, 283 F.3d 627, 632, 635 (4th Cir. 2002).

and to post-conference communications accompanied by "approval of the mediator or suggestions by him as to how to resolve disputed points in the ongoing exchange of settlement proposals following his initial involvement."[10]

In short, to invoke confidentiality as to post-conference communications, Block's own authorities require one or more of the following: (1) that the communication bears close temporal proximity to the conference; (2) that the communication consists of efforts to formalize an agreement reached at the conference; or (3) that the communication involves additional negotiation as to which the mediator has some connection.

Were not the limited reach of the parties' agreement dispositive, and were the Court inclined to accept Block's proposed extensions of the Act's protections, it might conclude that the November 3 letter (issued three workdays after the conference ended) satisfies the initial option.[11] The December 17 proposal submitted by Block, however, satisfies none of the three options.

First, the proposal was submitted a full seven weeks after the conference concluded, and Block has identified no authority for the proposition that such a tardy communication, by virtue of timing alone, can be sufficiently tied to mediation to be protected. Second, Block's attorney admitted that "[t]he parties also recognized that numerous issues ... remained to be worked out" after the conference and that his proposal "incorporates a few provisions Block considers appropriate even though they were not discussed in Dallas." This language refutes Block's suggestion that the parties were merely "attempt[ing] to document the agreement reached during

---

[10]*United States Fidelity & Guaranty Co. v. Dick Corporation,* 215 F.R.D. 503, 507 (W.D. Penn. 2003).

[11]However, because the Act protects only communications made in an alternate dispute resolution procedure (including mediation), and because mediation is defined as " a forum in which an impartial person, the mediator, facilitates communication between parties to promote reconciliation, settlement, or understanding among them," V.T.C.A. Civ. Prac. & Rem. Code § 154.023(a), it appears doubtful that Texas would recognize any option not requiring the continued involvement of a mediator.

the meeting." (Doc. 325 at 16).[12] Third, while the mediator expressed optimism that the parties would ultimately resolve their differences, there is no evidence that he remained the slightest bit involved in the parties' post-conference efforts to do so. On the contrary, his letter of November 1 reflects his understanding that his involvement in the matter was ended, and Block did not even copy him with its December 17 proposal.

Block asserts that its statement in its December 17 cover letter that the attached proposal was one "growing out of the parties' discussions in Dallas" serves to "confir[m] that the parties saw the post-meeting communications as an extension of the mediation." (Doc. 325 at 9 n.2).[13] Block offers no authority for the proposition that an assumption that mediation is ongoing is an acceptable substitute for evidence that, under applicable law, it is in fact ongoing. At any rate, the reference does not reflect that the parties viewed mediation as ongoing but only that, in conducting private settlement negotiations, the parties were not starting from square one but were building on the progress begun in mediation.[14]

Finally, Block leans on the general breadth of the Act, and the public policy of encouraging mediation, as reasons to interpret the Act in favor of providing protection in this case. (Doc. 308 at 6-10; Doc. 325 at 12, 13, 15). That the Act provides extensive protection *when it applies* is of course no justification for finding that it applies in a situation not encompassed by its language or, indeed, by any of Block's authorities collected from across the nation. Reliance on public policy favoring mediation begs the question of when mediation ends, and even Block's authorities — some of which invoked public policy — could not stretch the

---

[12]That the largest franchisee could find five pages worth of "questions and/or concerns" about Block's proposal simply underscores that the parties remained far apart on settlement. That no settlement agreement was ever consummated confirms that the gap was never bridged.

[13]It is worth noting that Block's present position that mediation was ongoing as of December 1999 is difficult to square with its repeated assertions that "the mediation" occurred only in October 1999. (Doc. 239 at 4; Doc. 308 at 4, 6, 10, 13, 15).

[14]Block also suggests that the mere fact it included the multiplier in the December 17 proposal of itself establishes the proposal as an extension of the mediation process. (*Id*. at 8). This suggestion is even less tenable than the last; the multiplier simply represented one of the building blocks upon which any eventual settlement would be based.

concept far enough to cover Block's predicament.

### 2. Rule 403.

Block's theory of unfair prejudice under Rule 403 is grounded in both ABS's alleged breach of the confidentiality agreement and Block's expectation of confidentiality based on the "public policy supporting the confidentiality of mediation." (Doc. 308 at 19). As noted in Part B.1, Block's usage of the multiplier will not violate the parties' agreement. Nor, having elected in its agreement to forego any protection the Act may afford for post-conference communications, could Block claim the benefit of any public policy undergirding such protection. Moreover, and as noted above, even absent the parties' agreement the public policy favoring mediation ends when mediation ends and, under Block's own authorities, mediation had ended at the time of the post-conference communications.

"'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis ...." *Steger v. General Electric Co.,* 318 F.3d 1066, 1079 (11th Cir. 2003)(internal quotes omitted). Since Block has not established any impropriety in ABS's reliance of the November 3 and December 17 repetitions of the multiplier proposal, their usage cannot be "unfair" for purposes of Rule 403.[15]

### C. Motion to Certify for Interlocutory Appeal.

As set forth in another order, certification requires that: (1) the order certified "involves a controlling of question of law"; (2) "as to which there is substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *accord McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1257 (11th Cir. 2004).

Block identifies the controlling question of law as "[w]hether a settlement proposal made in connection with a confidential mediation is admissible." (Doc. 308 at 21). The Court's

---

[15] ABS asserts without challenge that Block drafted the confidentiality agreement, (Doc. 315 at 2), so it has only itself to fault for the agreement's limited scope.

holding, however, resolves no such question. Instead, the Court's ruling in Part B.1 is based on its construction of the parties' agreement, independent of any issue of law raised by the parties.[16] The Court's ruling in Part B.2 is based on a straightforward application of Rule 403, and "[t]he antithesis of a proper § 1292(b) appeal is one that turns on ... whether the district court properly applied settled law to the facts or evidence in a particular case." *McFarlin v. Conseco Services,* 283 F.3d at 1259.

Moreover, and for the reasons stated in the Court's order denying Block's other motion to certify for interlocutory appeal, such an appeal from this order would not materially advance the ultimate termination of the litigation.

## CONCLUSION

For the reasons set forth above, ABS's motion to strike, Block's motion to exclude evidence of settlement proposals, and Block's alternative motion to certify for interlocutory appeal, are **denied**.

DONE and ORDERED this 12th day of December, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[16]The Court's exploration of the Act's parameters is not necessary to its decision but provides an alternate basis for the Court's ruling, should it be challenged on post-trial appeal.